**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

BELGAL,

*Petitioner*,

v.

GENALO, et al.,

*Respondents*.

Case No. 1:26-cv-6607

# PETITIONER'S REPLY IN SUPPORT OF HIS PETITION FOR A WRIT OF HABEAS CORPUS

Perry Hall McAninch
Elyssa N. Williams
THE LEGAL AID SOCIETY
Immigration Law Unit
49 Thomas Street, Fifth Floor
New York, NY 10013
T: (929) 219-6697
F: (646) 304-0876
pmcaninch@legal-aid.org
ewilliams@legal-aid.org

*Counsel for Petitioner*

## TABLE OF CONTENTS


INTRODUCTION .................... 1

ARGUMENT .................... 2

I. ICE PLAINLY ARRESTED OSCAR WITHOUT A STATUTORILY VALID WARRANT .................... 2

A. Respondents Have Failed to Provide Probative Evidence of a Valid Warrant .................... 4

B. Even if Respondents' Proffered Documents Were Sufficient to Evidence the Existence of a Form I-200 Predating ICE's Arrest, those Forms I-200 Are Statutorily Invalid as No NTA Had Been Issued at the Time of Oscar's Arrest. .................... 9

C. Release Is Required in Light of Respondents' Warrantless Arrest .................... 14

II. RESPONDENTS' OWN RECORDS DEMONSTRATE ICE'S FAILURE TO CONDUCT AN INDIVIDUALIZED REVIEW. .................... 16

III. A *MATHEWS* ANALYSIS FAVORS RELEASE. .................... 23

IV. OSCAR'S CLAIMS REGARDING ICE'S UNLAWFUL USE OF DEADLY FORCE ARE COGNIZABLE IN THIS ACTION. .................... 29

A. ICE's Brutal and Patently Unreasonable Use of Deadly Force Violates Oscar's Due Process Rights. .................... 29

B. Oscar's APA Claims Are Justiciable in these Habeas Proceedings, Brought in the District of Confinement. .................... 31

V. OSCAR CONTINUES TO SUFFER PHYSICAL PAIN FROM THE ACTIONS OF ICE. .................... 33

VI. EXHAUSTION IS NOT STATUTORILY REQUIRED AND THIS COURT SHOULD DECLINE TO APPLY ANY JUDICIAL EXHAUSTION REQUIREMENT. .................... 33

CONCLUSION .................... 37

## INTRODUCTION

Petitioner Oscar Belgal hereby submits this Reply to Respondents' opposition to his petition for a writ of habeas corpus. *See* ECF No. 18, Resp't Resp. to the Order to Show Cause ("Opp'n"); ECF No. 1, Verified Pet. for Writ of Habeas Corpus ("Pet.").

On October 8, 2026, U.S. Immigration and Customs Enforcement ("ICE") publicly brutalized Oscar in broad daylight, near a busy intersection, as his local community bustled home from school and work. Footage of the incident shows masked, anonymous individuals approaching Oscar's car with guns drawn, before one such individual, without identifying himself, shatters Oscar's window and begins firing into his car, where his five-year-old son sat cowering in the back seat.

All told, officers would fire at least seven bullets into Oscar's car without even having bothered to identify themselves. One of those bullets struck Oscar in the neck, immediately causing him to bleed and rendering him in life-threatening condition. And following their shooting, ICE officers slammed Oscar onto the pavement, where he would then lay, falling in and out of consciousness, while the officers refused to facilitate his transfer for emergency medical care.

Compounding the egregiousness of its actions, ICE did not even possess the statutory, regulatory or constitutional authority to make a civil arrest of Oscar, having not initiated any removal proceedings against him until the following day. Respondents furthered their violation of the applicable statutory, regulatory and constitutional authority by failing to provide Oscar with an individualized review before making the decision to detain him, as reflected in their own documents.

Respondents' answer to this Court's Order to Show Cause conveniently omits any reference to ICE's unmistakably barbaric shooting and arrest. Instead, Respondents attempt to evade this Court's scrutiny of their comprehensively illegal conduct, asking that the Court either excuse that conduct wholesale or shunt Oscar's request for release to the immigration court, where no adequate relief is available to him.

For the reasons articulated below, this Court should reject Respondents' justifications for their illegal acts and order Oscar's immediate release.

## ARGUMENT

### I. ICE PLAINLY ARRESTED OSCAR WITHOUT A STATUTORILY VALID WARRANT.

> *When the state reaches out and takes hold of a human being and deprives him of his liberty, that act must present itself as the people's act. Not eventually. Not upon later inquiry. At the moment it occurs. The person seized is not merely a subject of government power. His liberty is being constrained by an authority that, in a republic, derives from his own consent and the consent of those like him. For that authority to be legitimate, it must be visible as authority at the moment it is asserted.*[1]

The Immigration and Nationality Act ("INA") sets strict boundaries on ICE's arrest and detention authority. As relevant here, the INA provides, following the bounds of the Fourth Amendment, that only "[o]n a warrant issued by the Attorney General, [may a noncitizen] be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States." 8 U.S.C. § 1226(a). Administrative warrants for civil immigration arrests are contained in Forms I-200.

---

[1] *Urquilla-Ramos v. Trump*, 821 F.Supp.3d 603, 617 (S.D.W. Va. 2026).

Officials' authority to issue Form I-200 administrative warrants "derives from 8 C.F.R. §§ 236.1(b) and 1236.1(b) or their predecessor regulation (8 C.F.R. § 242.2)." *Castañon Nava v. Dep't of Homeland Sec.*, 806 F.Supp.3d 823, 849 (N.D. Ill. 2025), *aff'd in part sub nom. Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 175 F.4th 828 (7th Cir. 2026). The two parallel regulations state:

> (b) Warrant of arrest—
>
> (1) In general. **At the time of issuance of the notice to appear**, or at any time **thereafter** and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I-200, Warrant of Arrest. A warrant of arrest may be issued only by those immigration officers listed in § 287.5(e)(2) of 8 CFR chapter I and may be served only by those immigration officers listed in § 287.5(e)(3) of 8 CFR chapter I.

8 C.F.R. §§ 236.1(b), 1236.1(b) (emphasis added).

In other words, Congress, through § 1226(a), and the Department of Justice, through its implementing regulations, have articulated a specific order of operations through which—an only through which—ICE can exercise its arrest and detention authority. That order of operations is unequivocally clear: a notice to appear ("NTA") charging an individual as removable **must** be issued before any administrative warrant can become operative.

These requirements are not mere formalisms but rather comprise a set of procedural protections designed to ensure that our most basic liberties are not summarily revoked without cause. Indeed, "placing someone in removal proceedings is no mere administrative paperwork matter[;]" "it requires a full examination of a person's immigration record to verify that there is in fact a basis for removal."

*Yeleshev v. Larocco*, No. 26-CV-2294 (SJB), 2026 WL 1353806, at *3 (E.D.N.Y. May 14, 2026). Thus, where ICE arrests and detains an individual without having charged them as removable, it flagrantly disregards the most elemental restriction on its authority.

Respondents openly admit that no NTA had even been *created* prior to or contemporaneous with Oscar's brutal ICE arrest. But they do not contend that ICE possessed the authority to conduct a warrantless arrest of Oscar;[2] rather, they claim that their violations of these clear statutory requirements should be excused by this Court.

For the reasons articulated below, this Court should follow the overwhelming majority of courts to consider this issue within this Circuit and across the country, and find ICE's actions illegal such that immediate release is required.

### A. __Respondents Have Failed to Provide Probative Evidence of a Valid Warrant__.

To support their claim that ICE's arrest of Oscar was not warrantless, Respondents produce two documents titled as Forms I-200. *See* ECF Nos. 18-1, 18-2. Those alleged Forms I-200 are dated September 18, 2026, and October 8, 2026, respectively. But Respondents' proffer alone is insufficient for this Court to determine

---

[2] Accordingly, Respondents have waived any argument to the contrary. *See Mendoza v. Noem*, 26-cv-1260 (LJL), 2026 WL 1470652, at *4 (S.D.N.Y. May 26, 2026) ("By failing to respond, and by offering no real excuse for that failure, Respondents have effectively consented to the motion. . . . Respondents should not be permitted to further delay matters by failing to respond, only belatedly offering an oral opposition, and thereby depriving Petitioner of the opportunity to reply (lest he agree to spend additional time detained while the issues are further briefed).").

whether ICE possessed a statutorily valid warrant when arresting Oscar. And in light of Respondents' blatant misrepresentations in this case and countless others, this Court should decline to credit their representations.

DHS's purported Forms I-200 are deficient in several material aspects. Critically, DHS policy requires ICE officers to use electronic signatures which capture the date and time of signing, "whenever practical." U.S. DEP'T OF HOMELAND SEC., DHS SENSITIVE SYSTEMS POLICY DIRECTIVE 4300A (July 27, 2017)[3] at 13; DEP'T OF HOMELAND SEC., ELECTRONIC SIGNATURE USE, ACCEPTANCE, AND IMPLEMENTATION GUIDANCE (Mar. 21, 2022)[4] at 6 ("When applicable, the electronic signature collection 201 system must concurrently capture the date and time that the record was signed[.]"). And indeed, several of the documents proffered by Respondents in these proceedings appear to conform with those requirements. *See, e.g.*, ECF No. 18-3, Notice to Appear; ECF No. 18-4, Notice of Custody Determination; ECF No. 18-7, *Velasaca* Worksheet.

Nonetheless, ICE conspicuously declined to comply with its electronic signature requirements on both of the purported Forms I-200 proffered in these proceedings, and as such neither contains a timestamp indicating when the documents were signed, even though at least the signature on the September 18 Form I-200 was partially completed electronically. *See* ECF No. 18-1 (showing Supervisory

---

[3]https://www.dhs.gov/sites/default/files/publications/Sensitive%20Systems%20Policy%20Directive%204300A.pdf.

[44] https://www.dhs.gov/sites/default/files/2023-06/4300A%20ITSSP%20SS%20Attachment%20Z%20%20DHS%20eSignature%20Guidance.pdf.

Detention and Deportation Officer ("SDDO") Brendan Cuni's electronically-printed title, but not including a timestamp).

Moreover, neither Form I-200 contains the name of the officer who allegedly effectuated service of those documents nor the name and title of the individual who allegedly read the documents' contents in the Spanish language. *See* ECF Nos. 18-1, 18-2.

Respondents' failures are not mere technical violations but rather material deficiencies that cut to the heart of the issues raised in Oscar's petition: whether ICE acted with legal authority in effectuating its patently inhumane arrest. Respondents' errors further deprive this Court of assurance as to the documents' authenticity—particularly given that Respondents have declined to provide anyone who can swear to their version of the events of October 8 and 9 or to the validity of the purported warrants.[5]

Moreover, these failures are especially concerning as the individual who purported to sign the Forms I-200, SDDO Brendan Cuni, has been found by district courts to have falsified Forms I-200 and other sworn statements on multiple occasions

---

[5] Notably, not only is the Form I-213 submitted in these proceedings plainly infected with unreliable hearsay, Respondents have elected to redact the signature and information of the deportation officer who purportedly prepared and signed it. *See* ECF No. 18-10. Thus, the Court has no way to determine whether it was prepared by an authorized official. And either way, the contents make explicit that the form was not prepared by an officer with personal knowledge of the events of October 8 and 9. *See Curimilma Quille v. Blanche*, No. 26-CV-2818 (HG), 2026 WL 1453889, at *6 (E.D.N.Y. May 22, 2026) (noting a "dearth of personal knowledge" as to relevant events during petitioner's arrest). And as in *Quille*, that uncertainty creates an "even more pronounced" risk as Oscar disputes many assertions by ICE that are material to the instant petition. *Id.*; *see generally* Pet.

—and as recently as October 5, 2026. For example, in June 2026, ***this very Court*** ordered SDDO Cuni to "correct and withdraw certain inaccurate, sworn representations" made to the Court in habeas proceedings. *See* Order, *Munoz Cubides v. Moldanado, Jr.*, No. 26-CV-3062 (HG) (June 12, 2026). And in August 2026, U.S. District Judge Brian Cogan, of this District, found Cuni had lied in sworn statements, including by falsely claiming that he had obtained a warrant for a habeas petitioner's ICE arrest—a fabricated narrative later proven so by video footage. *See Chaglla v. Maldonado*, No. 26-CV-4308 (BMC), 2026 WL 2529494 (E.D.N.Y. Aug. 27, 2026). Similarly, on October 5, 2026, U.S. District Judge Gary Brown, also of this District, considering the habeas petition of an individual arrested by a cohort of ICE agents that included Cuni, found that Cuni had issued a fraudulent arrest warrant in which he falsely claimed that the petitioner could be positively identified by biometrics, then later attempted to clean up his tracks by entering the petitioner's name into the database after the fact so that it would appear that the record had already existed at the time he fabricated the warrant. *Almonte v. Genalo*, No. CV 26-3633 (GRB), 2026 WL 2983349, at *9–10 (E.D.N.Y. Oct. 5, 2026).

Respondents' actions rendering the Forms I-200 suspect in this case substantially mirror their actions in countless other cases, supporting a conclusion that the alleged warrants discussed herein should not be considered valid on their face. *See e.g.*, *Clarke v. U.S. Dep't of Homeland Sec.*, No. 25-CV-6773 (GRB), 2025 WL 3674471, at *4–5 (E.D.N.Y. Dec. 18, 2025) (addressing myriad "rank hearsay" and "evasive and demonstrably false" statements by an ICE SDDO); *Mira Castro v. Noem*,

819 F.Supp.3d 211, 217 (E.D.N.Y. 2026) (noting the "arresting officer falsely asserted that [petitioner's] work authorization was invalid and thereafter arrested him without a warrant and detained him."); *Minarcaja Concha v. Lyons*, 818 F.Supp.3d 495, 497–498 (E.D.N.Y. 2026) (finding that an ICE officer submitted false statements about petitioner's location after petitioner had been transferred in violation of court orders); ; *Parada Cruz v. Mullin*, 837 F.Supp.3d 404, 410, 413–14 (E.D.N.Y. 2026) (internal quotation omitted) ("Another relevant purpose [of an ordered evidentiary hearing] was to probe the declarations submitted by ICE officers, which appear to be substantially similar to those submitted in other cases in this District, and that have been found to be demonstrably false. . . . Here, the USAO first sought to delay and adjourn the hearings because of the need to consult with ICE. What followed was not an attempt to explain, justify, or contextualize the illegal practices identified in [*Gopie v. Lyons*, No. 25-CV-05229-SJB, 2025 WL 3167130 (E.D.N.Y. Nov. 13, 2025)] or the post hoc NTAs and arrest warrants, but the legal missive discussed here. . . . The USAO has already been described by this Court and others of playing whack-a-mole with people's lives . . . That loss is accentuated when the USAO seeks to shroud in darkness the conduct of the ICE officers here."); *E.T.G. v. Genalo*, No. 26-CV-4274-SJB, 2026 WL 2140351, at *4 (E.D.N.Y. July 25, 2026) (internal citations omitted) ("Once again, Respondents have proffered testimony from an ICE officer reflecting a gross misapprehension of ICE's arrest authority[.]"); *Perez Juarez v. Guadian*, No. CV 26-3109-BAH, 2026 WL 3026193, at *3 (D. Md. Sept. 4, 2026) (addressing, as here, ICE's "unsworn summary of the [arrest] encounter by an

unknown person, the value of which is severely undercut by the conflicting account of Petitioner[.]"); *Alfaro v. Mullin*, No. CV 26-0766 (GRB), 2026 WL 1382985, at *1 (E.D.N.Y. May 18, 2026) ("Given the factual record in this case (and similar cases) regarding ICE's enforcement practices, this representation [that ICE would not re-arrest the petitioner], standing alone, would not sufficiently reassure the Court.").

Considering Respondents' track record in this case and more broadly, this Court should decline to credit their proffered Forms I-200.

### B. Even if Respondents' Proffered Documents Were Sufficient to Evidence the Existence of a Form I-200 Predating ICE's Arrest, those Forms I-200 Are Statutorily Invalid as No NTA Had Been Issued at the Time of Oscar's Arrest.

Critically, however, even if Respondents' proffered Forms I-200 were genuinely created at the times Respondents claim, they would remain invalid for a distinct reason: that they were issued without connection to any pending removal proceedings.

"If ICE is going to use an arrest warrant, then there must be removal proceedings initiated before or at the time of the arrest." *Parada Cruz*, 837 F.Supp.3d at 409. **"There is no leeway" to this rule: "If ICE wants to use a warrant, it must have a valid NTA in place."** *Id.* at 409 (emphasis added); *see also Gopie*, 2025 WL 3167130, at *1 ("The NTA begins the removal process, and **at that time or after its issuance**, the Government can then effectuate his arrest, and, if necessary, detention, until removal proceedings are completed.") (emphasis added); *Cedeno Carreno v. Bondi*, No. 2:26-CV-1180 (NJC), 2026 WL 2969838, at *6 (E.D.N.Y. Oct. 2, 2026) ("[C]ourts around the country have rejected the notion that ICE may first arrest

and detain a noncitizen and only afterwards issue a Notice to Appear for removal proceedings."); *Arango v. Genalo*, No. 25-CV-6720 (RER), 2025 WL 3637500, at *2 (E.D.N.Y. Dec. 16, 2025) ("Because Arango was not served with a NTA under after her arrest, her due process rights were violated."); *J.G.G. v. Genalo*, No. 26-CV-5027 (AMD), 2026 WL 2547110, at *4 (E.D.N.Y. Aug. 28, 2026) ("ICE may only arrest a noncitizen 'at the time' or after the NTA is issued."); *Okeke v. Maldonado*, No. 26-CV-2714 (PKC), 2026 WL 2056904, at *4 (E.D.N.Y. July 16, 2026) ("There is no dispute here that Respondents failed to issue an NTA before arresting Petitioner pursuant to a Form I-200 Warrant. . . . [I]f a Form I-200 Warrant is without effect, it cannot serve as the predicate 'warrant issued by the Attorney General' necessary to justify arrest and detention under [§ 1226(a)]."); *E.T.G.*, 2026 WL 2140351, at *3 (internal quotation omitted) ("The NTA is the immigration version of a charging instrument, and the I-200 is the warrant that follows. Put differently, if ICE wants to use a warrant, it must have a valid NTA in place."); *Yeleshev*, 2026 WL 1353806, at *2 (internal citation omitted) ("[A]n I-200 cannot be used to effectuate an arrest before an NTA has been issued."); *Meza v. Francis*, No. 26-CV-02722 (NCM), 2026 WL 1734903, at *2 (E.D.N.Y. June 16, 2026) (same); *Clarke*, 2025 WL 3674471, at *2 (internal citation omitted) ("There remains a serious question as to whether the NTA preceded Clarke's arrest; if not, then ICE improperly arrested him."); *Aparicio v. Genalo*, No. 26-CV-1411 (NJC), 2026 WL 698872, at *5 (E.D.N.Y. Mar. 12, 2026) ("[T]he regulations require that removal proceedings are pending or at least that a Notice to Appear was served at the time of arrest."); *Anacona-Uni, v. Warden of MDC*,

No. 26-CV-6650 (PKC), 2026 WL 3168485, at *2 (E.D.N.Y. Oct. 22, 2026) (internal quotation omitted) ("Here, Respondents did not have a valid NTA in place at the time of Petitioner's arrest. Accordingly, when ICE arrested Petitioner, they had no authority to do so, which is a dispositive and independent basis to grant the writ."); *Pesantez Castro v. Maldonado*, No. 25-CV-06844 (JMA), 2025 WL 3723966, at *1 n.2 (E.D.N.Y. Dec. 23, 2025); *Quintero Meza v. Genalo*, No. 26-CV-7214 (VSB), 2026 WL 2875630, at *2 (S.D.N.Y. Sept. 24, 2026); *Lopez Romero v. Genalo*, No. 26 CIV. 6184 (AT), 2026 WL 2240720, at *2 (S.D.N.Y. Aug. 3, 2026); *Loaeza v. Bausch*, No. 26-CV-00945-MAV, 2026 WL 2150155, at *1 (W.D.N.Y. July 27, 2026); *Amin v. Venturella*, No. 9:26-CV-01520 (AMN), 2026 WL 2546857, at *3 (N.D.N.Y. Aug. 28, 2026); *Maldonado v. Bostock*, No. 2:23-CV-00760-LK-BAT, 2023 WL 5804021, at *3 (W.D. Wash. Aug. 8, 2023) ("Section 236.1(b) states that certain immigration officers have authority to issue and serve a Form I-200 arrest warrant '[a]t the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed[.]' **That does not mean that DHS may trigger Section 1226(a) at any time and in any circumstance . . . by issuing an arrest warrant**.") (emphasis added); *Mudiyanselage v. Warden California City Det. Facility*, No. 1:26-CV-02969-DAD-DMC-HC, 2026 WL 2364505, at *5 (E.D. Cal. Aug. 14, 2026), *report and recommendation adopted*, No. 1:26-CV-02969-DAD-DMC (HC), 2026 WL 2495014 (E.D. Cal. Aug. 25, 2026) ("The plain language of the statute establishes that Respondents' authority to issue a Form I-200 Warrant of Arrest begins after a Notice to Appear is issued."); *Castañon Nava*, 806 F.Supp.3d at 850–53 (rejecting proposition

that ICE, may issue warrants immediately upon identifying a noncitizen unlawfully present in the United States); *Hernandez v. Crosson*, No. CV-26-280-GF-BMM, 2026 WL 2280918 (D. Mont. Aug. 7, 2026) (internal citations omitted) (holding that ICE is prohibited from arresting individuals under § 1226(a) without a valid NTA); *Cancino Castellar v. McAleenan*, 388 F.Supp.3d 1218, 1224 (S.D. Cal. 2019) ("DHS regulations authorize an immigration officer to formally arrest and take the [noncitizen] into custody pursuant to a Form I-200 Warrant of Arrest *at the time an NTA is issued.*") (emphasis added).[6]

Thus, even if ICE had created a Form I-200 prior to its arrest of Oscar, his arrest could not have been pursuant to such a warrant, as no valid NTA had been

[6] Petitioner acknowledges that this Court has previously held that an NTA need not predate a warrant-based arrest where the NTA is served "at the time [a petitioner] is processed in connection with the I-200." *Ramirez v. Genalo*, No. 26-CV-3229 (HG), 2026 WL 1815771, at *4 (E.D.N.Y. June 24, 2026). Petitioner respectfully requests that the Court reconsider that holding under the controlling regulation, which provides only that "**At the time of issuance of the [NTA]**, the respondent may be arrested and taken into custody under the authority of [a] Form I-200." 8 C.F.R. §§ 236.1(b), 1236.1(b) (emphasis added). Thus, the relevant inquiry is whether the *arrest* predates the issuance of an NTA, not whether ICE's processing of that individual is contemporaneous with the issuance of an NTA. In other words, if no NTA has been issued, ICE lacks the authority to rely on Form I-200 arrest authority. In any event, unlike the petitioner in *Ramirez*, ICE did not issue an NTA against Oscar until more than 12 hours after arresting him, and several hours after "process[ing] [him] in connection with the I-200." *Ramirez*, 2026 WL 1815771, at *4. Accordingly, *Ramirez* is inapposite. *Cf. Viner v. Maldonado*, No. 26-CV-4696 (PKC), 2026 WL 2355437, at *2–3 (E.D.N.Y. Aug. 14, 2026) (issuance of NTA five hours after arrest improper); *Yeleshev*, 2026 WL 1353806, at *2 (concluding that, where an NTA was issued approximately 30–90 minutes after petitioner's arrest, "[a]lthough the time frame between the issuance of the arrest warrant and the issuance of the NTA here was relatively short, the law nonetheless does not permit what occurred."); *Okeke*, 2026 WL 2056904, at *4 (holding that arrest and detention was unlawful and ordering release where petitioner was arrested pursuant to an I-200 warrant nearly eleven hours before the NTA was issued).

issued at the time of the arrest. *See* ECF No. 18-3 (showing on ICE's notice to appear an ICE signature timestamp of October 9, 2026, at 6:05 AM—the day *after* Oscar's arrest).[7] Nor can ICE point to any reason why it could not have complied with the law: indeed, if, as Respondents allege, ICE had confirmed its belief that Oscar is removable via biometrics information as early as September 18, 2026, *see* ECF No. 18-1, and possessed information as to Oscar's residence, *see* ECF No. 18-10, then there is no reason why ICE could not have created and served the NTA by mail or in person prior to its arrest. But instead, ICE didn't even *create* its NTA until the day *after* that arrest.

Respondents' failure in this regard is material. First, in conducting a warrantless arrest, Respondents not only violated the regulatory scheme governing their arrest and detention authority, but also the statutory scheme and the Fifth Amendment. Section 1226(a) clearly provides that noncitizens may *only* be arrested and detained "[o]n a warrant" and "pending a decision on whether the [noncitizen] is to be removed from the United States." The regulation thus *derives from* the statutory text that requires that proceedings have been initiated before an individual can be taken into custody pursuant to § 1226(a). And as the INA further provides, an NTA is the document by which proceedings are initiated. *See* 8 U.S.C. § 1229(a)(1). Moreover, where ICE fails to produce a valid warrant upon arresting an individual pursuant to § 1226(a), it violates the Fifth Amendment. *See, e.g.*, *Okeke*, 2026 WL

---

[7] And notably, even the NTA issued the following day is procedurally deficient as it doesn't contain the signature or full name of the officer who alleges to have effected service of that document. ECF No. 18-3.

2056904; *J.G.G.*, 2026 WL 2547110; *Cedeno Carreno*, 2026 WL 2969838, at *5; *Amin*, 2026 WL 2546857, at *4; *see also Montilla v. I.N.S.*, 926 F.2d 162, 164 (2d Cir. 1991) ("The notion of fair play animating [the Fifth] [A]mendment precludes an agency from promulgating a regulation affecting individual liberty or interest, which the rule-maker may then with impunity ignore or disregard as it sees fit.").[8]

Moreover, as discussed below, *see infra* Section III, Oscar suffered clear prejudice as a result of Respondents' myriad failures to follow the law in arresting him. Most notably, having provided no assurance as to their identities or their enforcement authority via a warrant, Respondents set off a chain of events in which Oscar was seriously harmed and his young child traumatized.

Accordingly, ICE's arrest of Oscar was conducted without a valid warrant, in violation of the INA and the Fourth Amendment.

### C. **<u>Release Is Required in Light of Respondents' Warrantless Arrest</u>.**

ICE's warrantless, and therefore illegal, arrest demands Oscar's release. *See J.G.G.*, 2026 WL 2547110, at *5 (internal citations and quotation omitted) ("ICE's warrantless arrest of the petitioner violated Section 1226(a) and the Fifth Amendment. That is a dispositive and independent basis to grant the writ, so the Court does not address whether the petitioner's custody review was proper); *see also*

[8] Thus, the requirement that an NTA have been issued before an I-200 is acted upon should not be considered, as this Court has previously reasoned, an "agency-created right[] and privilege[]." *Gutama Gutama v. Maldonado, Jr.*, No. 26-CV-06556 (HG), 2026 WL 3152059, at *2 (E.D.N.Y. Oct. 21, 2026) (quoting *Gagea v. Maldonado*, No. 26-cv-4817, 2026 WL 2859032, at *2 (E.D.N.Y. Sept. 23, 2026)).

*Gopie*, 2025 WL 3167130, at *2 (quoting *Salgado v. Francis*, No. 25-cv-06524, 2025 WL 2806757, at *8 (S.D.N.Y. Oct. 1, 2025)) ("[A]n individual detained pursuant to Section 1226(a) who identifies some defect in the process governing her detention can raise that defect in a habeas action seeking release. . . . Accordingly, the Court deems petitioner's immediate release to be the appropriate remedy."); *Okeke*, 2026 WL 2056904, at *6 ("Respondents argue that they have complied with the custody determination procedures required by Section 1226(a) and thus are permitted to continue to detain him. But since the Court has found the arrest was unlawful to begin with, it could not have triggered Respondents' detention authority under Section 1226(a), and thus Respondents' authority to continue to detain Petitioner without a bond hearing is irrelevant."); *E.T.G.*, 2026 WL 2140351, at *4 ("Because E.T.G.'s arrest [prior to issuance of an NTA] was illegal, the writ is provisionally granted."); *Meza*, 2026 WL 1734903, at *3 (internal quotation omitted) ("[J]ust as a bond hearing before an immigration judge assumes that a valid custody determination was made in the first instance, it also assumes a valid arrest was made in the first instance. . . . To remedy the unlawful circumstances of petitioner's detention, petitioner is entitled to immediate release."). Indeed, as this Court has found, "the government's ongoing detention of [Oscar], in the face of the controlling law of this Circuit, is a failure of process that entitles him to immediate release." *Vargas v. Maldonado*, No. 26-CV-5223 (HG), 2026 WL 2606597, at *3 (E.D.N.Y. Sept. 3, 2026) (citing *Munaf v. Geren*, 553 U.S. 674, 693 (2008); *Preiser v. Rodriguez*, 411

U.S. 475, 484 (1973) ("[R]elease from illegal custody" is the "usual remedy by which a man is restored again to his liberty, if he ha[s] been against law deprived of it.").

## II. RESPONDENTS' OWN RECORDS DEMONSTRATE ICE'S FAILURE TO CONDUCT AN INDIVIDUALIZED REVIEW.

Moreover, Respondents did not conduct an individualized review prior to the decision to detain Oscar under § 1226(a), in violation of statutes, regulations, and due process. As reflected in the Petition, Oscar was not provided an opportunity for sufficiently individualized review because: (1) Respondents did not follow the required procedures and instead made their detention decision prior to conducting any interview of Oscar; and (2) any procedures Respondents claim to have engaged in were insufficient as a matter of due process, *see infra* Section III. Respondents' response to the Petition does not meaningfully contest these points, and in fact demonstrates that the decision to detain did not comport with the requirements for individualized review.

Respondents claim that "[a]t approximately 10:20 p.m., Petitioner was discharged from Allen Hospital, and transported to Newark, New Jersey for post-arrest processing and a custody determination." Opp'n at 3. Respondents further claim that at 12:37 a.m. on October 9, 2026, ICE "made the determination to detain Petitioner pursuant to [INA § 236(a)]." *Id.* at 3, citing ECF 18-4 (Form I-286). Respondents then claim that at approximately 3:27 a.m. ICE "issued and served" the Form I-286.[9] Opp'n at 3. Then, at 3:54 a.m., ICE completed a form "specifying the

---

[9] Notably, the Form I-286 has a digital date and signature from SDDO Brendan Cuni with a time stamp indicating, "Date: 2026.10.09 03:27:43-04'00'." ECF 18-4. However,

bases for the custody determination pursuant to a settlement agreement" in *Velesaca v. Decker*. Opp'n at 3. A few hours later, at 6:00 a.m., ICE claims to have served Oscar with a Notice to Appear, the charging document to initiate removal proceedings upon proper filing with the Immigration Court. Opp'n at 3, ECF 18-3 (NTA).

Even accepting Respondents' timeline as true—despite the fact that it is not supported by declarations of persons knowledgeable about the facts—Respondents repeatedly failed to comply with the process that is required for § 1226(a) detention. Because Respondents did not conduct an "individualized review" in accordance with the statutes, regulations, and due process, Oscar's detention is not justified and his habeas must be granted with an order for his release.

Immigration authorities may only "detain non-citizens during removal proceedings when Congress has authorized them to do so." *Zheng v. Rokosky*, 826 F.Supp.3d 545, 554 (D.N.J. 2026) (internal citation omitted). To detain under § 1226(a), DHS enforcement officials, including ICE agents, must make an initial custody determination. *See* 8 C.F.R. § 236.1(c)(8); *Velesaca v. Decker*, 458 F.Supp.3d 224, 241 (S.D.N.Y. 2020) (noting that the Government did "not dispute that 8 U.S.C. § 1226(a) and its implementing regulations require ICE officials to make an individualized custody determination"); *Tumba v. Francis*, 813 F.Supp.3d 394, 404 (S.D.N.Y. 2025) (a noncitizen detained under Section 1226 is entitled to "an

---

the separate line on the Form I-286 for "date and time of custody determination" reflects a typed insert of "10/9/2026 12:37AM." Respondents do not submit any signed declaration under oath to support their claim that the custody determination was made at 12:37a.m. but served at 3:27a.m., nor any explanation for how that reasoning explains the different dates and times on the Form I-286.

individualized determination by a DHS officer" as to whether to be conditionally released); *Lopez Benitez v. Francis*, 795 F.Supp.3d 475, 492–93 (S.D.N.Y. 2025) (that ICE officials are required to make an "individualized custody determination . . . follows from the text of § 1226(a)") (cleaned up). Under the regulations, an authorized officer may release a noncitizen if the noncitizen demonstrates that "such release would not pose a danger to property or persons, and that the [noncitizen] is likely to appear for any future proceeding." *Id.* "Although § 1226(a) affords immigration authorities discretion to detain or release a noncitizen, the exercise of that discretion necessarily requires consideration of the particular noncitizen's circumstances." *A.J.P.S. v. Benzel*, No. 1:26-CV-11858, 2026 WL 3131270, at *3 (D.N.J. Oct. 19, 2026).

The individual custody determination must be meaningful and sufficiently individualized, a proposition with which Respondents tacitly agree. *See* Opp'n at 3. Respondents note that a custody determination requires an interview "not least to obtain information as to a myriad of categories including family equities, medical issues, and other special vulnerabilities that may impact detention-related decisions." *Id.* And of course Respondents must agree; it is axiomatic that individualized review prior to a detention decision is a fundamental aspect of due process: "The purpose of requiring an exercise of discretion [under Section 1226(a)] prior to the decision to detain a noncitizen who is not subject to mandatory detention is to prevent an erroneous deprivation of liberty." *Lopez Benitez*, 795 F.Supp.3d at 495; *see also*, *C.L.Z. v. Maldonado*, No. 26-CV-5271 (HG), 2026 WL 2718652, at *3

(E.D.N.Y. Sept. 15, 2026) (concluding that the government could not substantiate its claim that noncitizen was afforded a meaningful, individualized review).

But Oscar was never given that opportunity here. Respondents' own documents reflect that they made the formal decision to detain Oscar at 12:37 a.m., and apparently notified him of that decision at 3:27 a.m. Opp'n at 3, 5. This is reflected in the Form I-286 Notice of Custody Determination, where SDDO Cuni signs the form saying he has "determined that. . . . you will be [d]etained by the Department of Homeland Security." ECF 18-4.[10] Respondents' response makes extremely clear that the decision to detain Oscar was made with the Form I-286. Opp'n at 3 ("During post-arrest processing, at approximately 12:37 a.m. on October 9, 2026, ICE made the determination to detain Petitioner pursuant to [INA] § 236(a).") (citing ECF 18-4).

As a preliminary matter, ICE's custody determination plainly violated the controlling regulations as it was conducted by the same officer who arrested Oscar, SDDO Cuni. *Compare* ECF Nos. 18-1, 18-2, *with* ECF No. 18-4; *see also Gopie*, 2025 WL 3167130, at *4 n.6 ("[F]undamentally, [8 C.F.R. § 287.3(b)] contemplates an immigration officer, **other than the arresting agent**, examining the individual in order to see if ICE should proceed with the case (and that was not done here)) (emphasis added).

[10] In fact, it is likely that ICE made the decision to detain many hours earlier, when they transported Oscar in the ICE vehicle from the New York Presbyterian-Allen hospital to the ICE detention center in New Jersey. Nonetheless, the Notice of Custody Determination was signed at 12:37 a.m. and unequivocally reflects their detention decision at that time.

Also fatal to Respondents' argument is their concession that only *after* making the custody determination did they engage in the *Velesaca* processing and some version of individualized review. Opp'n at 3. The very purpose of the *Velesaca* interview and worksheet is to ensure that the required, individualized process is undertaken prior to making a detention decision. This interview process ensures that the noncitizen has a meaningful opportunity to demonstrate that he is not a danger or flight risk. *See* Ex. A, *Velesaca* Stipulation, ¶¶ 5–6, 8, 13, 23, 25–6.[11] The *Velesaca* litigation specifically challenged a policy of the ICE New York Field Office[12] where "individuals detained under 8 U.S.C. § 1226(a) were, as a matter of policy and practice, denied bond or release without an individualized determination of whether detention was justified." *Velesaca v. Decker*, No. 20 CIV. 1803 (AKH), 2026 WL 1678437, at *1 (S.D.N.Y. June 10, 2026). "Under the settlement, Defendants agreed . . . to make individualized custody determinations for covered noncitizens detained under § 1226(a), and that those covered noncitizens should be released 'if he or she establishes, on a case-by-case basis, to the officer's satisfaction that he or she

[11] The *Velesaca* settlement was entered on or about March 10, 2022, and was initially valid for three years. Ex. A. However, prior to the expiration, the Plaintiffs filed a Motion to Enforce alleging violations of the settlement. The Court ordered the parties to create a compliance plan, and the three year duration of the Settlement Order has been tolled and remains in effect. Ex. B, *Velesaca* Order Granting Motion to Enforce the Settlement Agreement.

[12] The Notice of Custody Determination signed by SDDO Cuni states the location of the custody determination as "Docket Control Office New York, 26 Federal Plaza, New York, NY US.," confirming that Oscar's detention was controlled by the ICE New York Field Office. ECF 18-4. The applicability of *Velesaca* is further confirmed by the fact that SDDO Cuni filled out a *Velesaca* worksheet. ECF 18-7. There is no question here that the *Velesaca* requirements apply to Oscar's detention.

does not present a danger to the community or a flight risk . . . as a matter of discretion in light of the individual circumstances.'" *Id.* Inherent in the binding *Velesaca* stipulation is the requirement that a noncitizen be provided a meaningful opportunity for review prior to a final custody determination by ICE. "Although § 1226(a) affords immigration authorities discretion to detain or release a noncitizen, the exercise of that discretion necessarily requires consideration of the particular noncitizen's circumstances." *A.J.P.S.*, 2026 WL 3131270 at *3; s*ee Lopez Benitez*, 795 F.Supp.3d at 493 ("If all noncitizens subject to § 1226(a) could simply be detained on a categorical (or arbitrary) basis without any kind of individualized assessment, it would make little sense to permit such individuals an opportunity to challenge their detention by an appeal before an immigration judge on the basis of specific factors such as dangerousness or flight risk."). In fact, Respondents' response also points out that it is the *noncitizen* who must demonstrate that he should not be detained under § 1226(a), to the satisfaction of the ICE officer. Opp'n at 4-5 (citing 8 C.F.R. § 236.1(c)(8)). To do so, a noncitizen must necessarily have the *opportunity* to make such a demonstration. In this case, because Respondents made a custody determination well before engaging in the required individualized assessment, their custody determination is contrary to the statutes and regulations and is unlawful.

Even if Respondents' claim of a belated review could be squared under the law—which it cannot—the review in this case was not sufficiently individualized and Oscar was accordingly prevented from meaningfully participating. Respondents do not claim to have questioned Oscar, despite their concession that they should have.

Opp'n at 3. Oscar does not recall being asked any questions about his family, his community ties, the circumstances of his grand larceny conviction that is on appeal, his current medical state or any other factors that would provide meaningful individualized review. *See* Pet. ¶ 79 ("Oscar vehemently denies involvement with any gang or organized criminal organization."). Even if Respondents could be assumed to have asked appropriate questions, of which there is no evidence, the Notice of Custody Determination and the *Velesaca* worksheet are all signed by SDDO Cuni in the hours after Oscar was removed from the hospital. ECF 18-4, 18-7.[13] It is understood that SDDO Cuni was involved in the shooting of Oscar, and from video footage appears to be the officer who was wearing a construction vest and carrying an assault rifle while Oscar was shot in the neck with his son was in the backseat. Pet. ¶¶ 63–64. SDDO Cuni has also repeatedly been found to lie under oath in the district court. *See supra* at 6. Not only does Oscar deny receiving an opportunity for individualized review, and Respondents documents also suggest this did not take place, the fact that SDDO Cuni claims to have conducted any such individualized, belated custody determination requires a conclusion that Oscar was denied a meaningful opportunity to engage in an adequate, individualized interview process.

Respondents attempt to brush aside the lack of individualized review claim, Pet., Count IV, by arguing that the detention decision is discretionary and need not take place "prior to or at the exact moment of arrest." Opp'n at 5. However, both

---

[13] Respondents conspicuously do not mention the shooting by the ICE officers in their response, however, they do not otherwise meaningfully contest the timeline of events following the shooting.

arguments miss the mark. "The Court assesses whether and how correct procedures were applied at all (they were either not applied or applied erroneously) and ultimately, whether [Oscar's] detention comports with due process (it does not)." *Pastrana-Beltran v. Mullin*, No. 26-CV-2657 (RER), 2026 WL 1398609, at *3 (E.D.N.Y. May 19, 2026) (citing *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001)); *see also*, *Chen v. Mullin*, No. 26-CV-5498 (HG), 2026 WL 2949111, at *3 (E.D.N.Y. Oct. 1, 2026) ("Here, the Court's assessment of how ICE applied the procedures of Section 1226(a) leads it to the inescapable conclusion that, with respect to Petitioner's initial custody determination, the relevant procedures were, at the very least, 'applied erroneously.' ") Oscar is entitled to habeas relief because the Respondents did not engage in the required process for arriving at an individualized custody review; they failed to follow the statute and regulations and denied Oscar due process. Osar's release is therefore required. *See Pastrana-Beltran*, 2026 WL 1398609, at *3 (ordering release based on the constitutional violation from Respondents' failure to conduct individualized assessment before detention.)

## III. A *MATHEWS* ANALYSIS FAVORS RELEASE.

The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "[T]he Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. To determine what process is due, courts apply the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *See*, *e.g.*,

*Rodriguez-Acurio v. Almodovar*, 811 F.Supp.3d 274, 318 (E.D.N.Y. 2025), appeal dismissed, No. 26-219, 2026 WL 1208948 (2d Cir. Feb. 25, 2026) (applying *Mathews* factors in immigration habeas); *Cajamarca-Janza v. Soto*, No. 26-CV-3066 (HG), 2026 WL 1506777, at *3 (E.D.N.Y. May 29, 2026) ("At bottom, the primary question is whether the government's detention of Petitioner violates his due process rights. Accordingly, the Court applies the *Mathews* test.").

As this Court is well-aware, a *Mathews* analysis requires the weighing of three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

Here, the first factor weighs heavily in Oscar's favor, as his detention directly implicates his fundamental interest in physical liberty. *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) ("[T]he most elemental of liberty interests [is] the interest in being free from physical detention by [the] government."); *see also Velasco Lopez*, 978 F.3d at 851. A person's liberty cannot be abridged without "adequate procedural protections." *Zadvydas*, 533 U.S. at 690.

The second *Mathews* factor likewise weighs heavily in Oscar's favor. The absence of a valid warrant and the absence of an individualized custody determination creates a substantial risk for erroneous deprivation of liberty. *See*, e.g.,

*Cedeno Carreno*, 2026 WL 2969838, at *5 ("Considering the second factor, the procedures used by ICE give rise to an extraordinarily significant risk of erroneous deprivation of [ ] liberty because they run afoul of both the plain text of Section 1226(a) and its implementing regulations."); *Huamani v. Francis*, No. 25-cv-8110, 2025 WL 3079014, at *7 (S.D.N.Y. Nov. 4, 2025) ("Due Process still requires that such discretion actually be exercised—i.e., that some determination actually be made."). Oscar argues that he was wrongfully detained by ICE absent pending removal proceedings or a valid warrant and without an individualized determination of his flight risk or dangerousness. He therefore "does not contend that greater 'judicial-type procedures must be imposed upon the administrative actions' of [DHS] than those already required by law; [rather, he] argues that the agency must comply with the procedures already in place, and its failure to do so amounts to a complete and arbitrary denial of due process." *Kelly v. Almodovar*, No. 25-cv-06448 (AT), 2025 WL 2381591, at *3 (S.D.N.Y. Aug. 15, 2025) (quoting *Velasco Lopez*, 978 F.3d at 851). By failing to serve a Notice to Appear, and failing to follow the statutory requirements to initiate removal proceedings before obtaining any necessary warrant, Respondents never allowed Oscar the opportunity to appear in court for removal proceedings; instead Respondents shot into Oscar's vehicle while his child was in the backseat, hitting Oscar in the neck and leaving him bloodied and in fear for his life. Pet. ¶¶ 60–72. The value of adherence to established statutory and regulatory safeguards, simply by requiring Respondents to identify themselves as ICE officers and show a valid I-200 warrant based on an NTA issued in removal proceedings, is plainly immense. *See*

*Urquilla-Ramos*, 821 F.Supp.3d at 624 ("When officers can wear a mask, fail to verify their credentials, refuse to disclose their name, arrive in an unmarked vehicle, and neglect to provide a justification for their seizure of an individual, the constitutional protection that the Framers envisioned has not just been corroded—it has been eviscerated."). Additionally, by making a custody determination on the Form I-286 without the opportunity for Oscar to engage in an individualized review, Oscar was denied the opportunity to explain that he picks his son up from school each day, that he works to support his partner and two children, that his criminal case is on appeal and that he has always abided by criminal court warrants and attended criminal court appearances and would likewise abide by any ICE requirements. Pet. ¶¶ 58–60, ECF 18-8 (RAP sheet confirming that Oscar has never failed to appear for a court date). *See Teopanta Salazar v. Francis,* No. 1:26-CV-07160 (JLR), 2026 WL 2583068, at *6 (S.D.N.Y. Sept. 1, 2026) (finding a custody review insufficiently individualized including because officers failed to consider evidence of noncitizen's family ties), *see also Curimilma Quille v. Blanche*, No. 26-cv-02818 (HG), 2026 WL 1453889, at *4 (E.D.N.Y. May 22, 2026) (finding ICE's initial custody determination inadequate, and thus violative of due process, where ICE found that petitioner lacked community ties, yet ICE's own records from the arrest indicated that petitioner had a U.S.-born child and " 'called his girlfriend' after his arrest" (citation omitted)).

Respondents' failures to adhere to procedural requirements is irreconcilable with the requirements of due process. Detention under § 1226(a) has certain rules that were not followed here, including issuance of a warrant after the initiation of

removal proceedings and an individualized custody determination made prior to detention. The lack of this bare minimum process significantly increases the risk of erroneous detention. *See, e.g., Diallo v. Maldonado*, No. 25-CV-05740 (DG), 2025 WL 3158295, at *5 (E.D.N.Y. Nov. 12, 2025) (finding the lack of individualized review in the parole revocation process violated due process); *Chen v. Mullin*, No. 26-CV-5498 (HG), 2026 WL 2949111, at *4 (E.D.N.Y. Oct. 1, 2026) (applying the *Mathews* test, finding initial custody determination inadequate and ordering immediate release); *C.L.Z.*, 2026 WL 2718652, at *3 (ordering release based on insufficiently individualized review under § 1226(a)); *Cajamarca-Janza*, 2026 WL 1506777, at *3 (same). Notably, "[t]he only interest to be considered at this part of the *Mathews* analysis is that of the detained individuals—not the government." *Black*, 103 F.4th at 152 (citing *Hamdi*, 542 U.S. at 530). The value of the proposed safeguards, namely requiring the Respondents to follow already established regulations and statutes requiring initiating removal proceedings and obtaining a proper warrant, then conducting a sufficiently individualized review, is immense. *See Urquilla-Ramos*, 821 F.Supp.3d at 631 ("Here, Petitioner received none of what due process requires. He was seized without warrant, given no notice of the basis for his detention, and transported to a regional jail without any opportunity to be heard before a neutral decisionmaker. What the government offered instead was a fait accompli: seizure, transport, imprisonment, and the suggestion that review could be sought of a deprivation already complete, through mechanisms controlled by the detaining authority. That is not due process. It is the absence of it.")

Lastly, the third *Mathews* factor requires consideration of the government's interests, including the administrative burdens associated with additional procedural safeguards. While the government's interests in immigration detention include "ensuring the appearance of [noncitizens] at future immigration proceedings" and "preventing danger to the community," s*ee*, e.g., *Zadvydas*, 533 U.S. at 690 (cleaned up), it also has an interest in "minimizing the enormous impact of incarceration in cases where it serves no purpose." *Velasco Lopez*, 978 F.3d at 852. Certainly the government's interest in civil immigration detention "can never be punitive, either by design or effect." *Rashid v. Trump*, 807 F. Supp. 3d 349, 364 (D. Vt. 2025). The government does not have any interest in shooting a noncitizen in front of his child to make a civil immigration arrest, especially when the statutes and regulations proscribe specific procedures intended to conform with due process and provide for lawful civil arrests. The government's interests are likewise not impacted by requiring ICE to meaningfully assess whether a particular noncitizen presents a danger or flight risk. *A.J.P.S.*, 2026 WL 3131270 at *6 (Finding that although the government's interests are substantial, "requiring ICE to meaningfully assess whether a particular noncitizen presents a danger or flight risk imposes little additional burden because ICE is already responsible for making an initial custody determination under the regulatory framework.")

Taken together, the *Mathews* factors weigh decisively in Oscar's favor. The significant deprivation of physical liberty, the risk of erroneous detention absent individualized consideration, and the limited additional burden of requiring ICE to

obtain a valid warrant and properly exercise the discretion already conferred upon it establish that Oscar's detention violated his procedural due process rights.

## IV. OSCAR'S CLAIMS REGARDING ICE'S UNLAWFUL USE OF DEADLY FORCE ARE COGNIZABLE IN THIS ACTION.

> *An anonymous government is no government at all. It cannot be held accountable. A masked agent freely uses force without justifying his actions, and the public cannot name him to challenge his conduct.*[14]

Nor can ICE evade review of its patently illegal use of deadly force. Respondents do not defend ICE's actions—shooting Oscar in the neck in front of his five-year-old son, before slamming him on the ground and knocking him into semi-consciousness—as reasonable. Instead, Respondents opt to make no mention of that illegal use of force, clearly intending to avoid this Court's scrutiny. But contrary to Respondents' assertions, this Court plainly has jurisdiction to review the claims to relief arising out of that objectively unreasonable use of extreme force.

### A. <u>ICE's Brutal and Patently Unreasonable Use of Deadly Force Violates Oscar's Due Process Rights</u>.

It is well-established that noncitizens possess a substantive Fifth Amendment right "to be free from unjustified deprivations of liberty." *See Martinez v. McAleenan*, 385 F.Supp.3d 349, 357 (S.D.N.Y. 2019) (citing *Zadvydas*, 533 U.S. at 690). It is further well-settled that the "application of undue force by law enforcement officers deprives a suspect of liberty without due process of law." *Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir. 1973); *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348 (1986))

---

[14] *Urquilla-Ramos*, 821 F.Supp.3d at 632.

("Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing its power, or employing it as an instrument of oppression[.]'"); *Martinez*, 385 F.Supp.3d at 356 (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)).

"Even though the concept of due process of law is not final and fixed, [substantive due process] limits are derived from considerations that are fused in the whole nature of or judicial process." *Rochin*, 342 U.S. at 170 (internal citation omitted). Thus, where a criminal conviction is obtained through governmental conduct that "shocks the conscience," for example, the Supreme Court has held that such a conviction must be reversed. *Id*. at 170–74 ("It has long since ceased to be true that due process of law is heedless of the means by which otherwise relevant and credible evidence is obtained. . . . [Supreme Court cases regarding coerced confessions] are only instances of the general requirement that States in their prosecutions respect certain decencies of civilized conduct."). To hold otherwise, and "to sanction the brutal conduct," the Supreme Court held, "would be to afford brutality the cloak of law." *Id*. at 173.

These proceedings demand the same logic, especially considering that the constitutional constraints on civil detention are even higher than in the criminal context. *See Zadvydas*, 533 U.S. at 690; *see also Addington v. Texas*, 441 U.S. 418, 425 (1979) ("[C]ivil commitment for any purpose constitutes a significant deprivation of liberty[.]"). Indeed, it is difficult to imagine conduct which could shock the conscience, and involve "force so brutal and so offensive to human dignity," more than

that discussed in these proceedings: masked, anonymous men approaching Oscar's vehicle—where his five-year-old son sat—with guns drawn, firing seven shots into that vehicle without identifying themselves, slamming Oscar onto the ground upon his pleas for emergency medical care, and later *lying* to emergency care providers about their knowledge of the very harm *they caused* after being asked directly as to how Oscar came to be harmed. *See* Pet'r Mot. for Emergency Release at 10–11.

Oscar's current detention was thus obtained through an illegal use of force—a violation that infects his detention and renders it unlawful. Thus, this Court is empowered to order Oscar's release, as his detention is "in violation of the Constitution or laws or treaties of the United States" on that basis. 28 U.S.C. § 2241. A contrary ruling would "afford [ICE's] brutality the cloak of law." *Rochin*, 342 U.S. at 173.

### B. **Oscar's APA Claims Are Justiciable in these Habeas Proceedings, Brought in the District of Confinement.**

Moreover, contrary to Respondents' assertion, this Court possesses the authority to rule on Oscar's claim under the Administrative Procedure Act ("APA"). Respondents' citation to *Trump v. J.G.G.*, 604 U.S. 670, 671 (2025), for the proposition that "claims under statutes including the APA that necessarily imply the invalidity of a detainee's confinement" may be brought only in habeas, is inapt in these proceedings, which were properly initiated by a petition for writ of habeas corpus in the district of Oscar's confinement. Opp'n at 4 n.4.

In *J.G.G.*, civil detainees sought equitable relief against the implementation of Proclamation No. 10903,[15] through which President Trump invoked the Alien Enemies Act ("AEA"). Rev. Stat. § 4067, 50 U.S.C. § 21. Vacating the temporary restraining orders entered in the detainees' favors at lower courts, the Supreme Court held that the detainees' challenge to their removal under the AEA "necessarily impl[ied] the invalidity of their confinement" and therefore could only be brought in habeas in the district of confinement, and not in the District of Columbia. *J.G.G.*, 604 U.S. at 672 (internal quotation marks omitted). Notably, the majority clarified that, in *J.G.G.*, "[t]he only question is *which* court will resolve that challenge," and not the availability of judicial review. *Id.* at 673 (emphasis added).

That is exactly what Oscar has done here: through his habeas petition, he challenges the legality of his detention under the APA and Respondents do not contest that venue is proper in this District. As such, *J.G.G.* is inapposite to these proceedings, especially considering the strong presumption in favor of judicial review of federal administrative actions. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 140–41 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977) (internal citation and quotation marks omitted) ("[The APA's] generous review provisions must be given a hospitable interpretation"; "only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial

---

[15] Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13034.

review.”). As another court within this Circuit has stated, addressing Respondents’ arguments herein:

> Respondent has provided no credible reason a violation of the APA could not result in relief under habeas. First, Respondent argues that the Supreme Court in *Trump v. J.G.G.* held as much by stating that claims under statutes including the APA that “necessarily imply the invalidity of their confinement” are “within the core of the writ of habeas corpus and thus must be brought in habeas” in the district of confinement. That is, in fact, exactly what the Petitioner here has done; unlike in *J.G.G.*, the petitioner seeks a finding that his confinement is invalid through habeas, not through a standalone APA cause of action. Second, 5 U.S.C. § 704, which states that claims under the APA are not available where there was another adequate remedy in a court, does not preclude relief in habeas. Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions. Where, as here, the respondent has identified no such procedures by which plaintiffs could have pursued their claims outside the APA, that section of the statute poses no bar to relief.

*J.R.U. v. Genalo*, No. 26-CV-4332 (LJL), 2026 WL 1864975, at *13 n.4 (S.D.N.Y. June 29, 2026) (internal quotations omitted).

## V. OSCAR CONTINUES TO SUFFER PHYSICAL PAIN FROM THE ACTIONS OF ICE.

Respondents do not respond to the additional habeas claims pertaining to Oscar’s inadequate medical care and violation of the Rehabilitation Act and APA and raised in his petition, and Oscar relies on his arguments as contained therein. Pet. ¶¶ 131–34, Count Seven; *see generally* Opp’n.

## VI. EXHAUSTION IS NOT STATUTORILY REQUIRED AND THIS COURT SHOULD DECLINE TO APPLY ANY JUDICIAL EXHAUSTION REQUIREMENT.

Lastly, this action should not be dismissed or paused for lack of administrative exhaustion. There is no statutory exhaustion requirement in the immigration habeas context. *See Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003), *as amended* (July 24,

2003); *see also Garcia v. Decker*, 448 F.Supp.3d 297, 305 (S.D.N.Y. 2020) ("[N]o federal statute requires a person in immigration detention to exhaust internal administrative remedies before filing a claim in federal court on the ground that he or she is being detained unconstitutionally."). While some courts have applied the "less stringent judicial exhaustion requirement" as a prudential matter, *id.*; *see also, e.g.*, *Michalski v. Decker*, 279 F.Supp.3d 487, 495 (S.D.N.Y. 2018), exhaustion may only be required where it serves to "protect[] the authority of administrative agencies, limit[] interference in agency affairs, develop[] the factual record to make judicial review more efficient, [or] resolv[e] issues to render judicial review unnecessary." *Beharry*, 329 F.3d at 62. Thus, courts routinely excuse exhaustion where: "(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question." *Beharry*, 329 F.3d at 62 (internal citations omitted). Contrary to Respondents' assertions, each exception applies in this case.

First, it cannot be reasonably disputed that the immigration court lacks the authority to afford Oscar adequate relief for the constitutional, statutory, and regulatory violations Respondents have committed and are committing. Indeed, not only is the Executive Officer for Immigration Review explicitly disempowered to consider Oscar's constitutional claims,[16] it is *only empowered* to consider one narrow

[16] *See Matter of Guerra*, 24 I&N Dec. 37, 39 (BIA 2006) ("A [noncitizen] in removal proceedings has no constitutional right to release on bond.") (internal citation

question: whether a noncitizen has "show[n] to the satisfaction of the Immigration Judge" that he or she is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk" such that he or she "merits release on bond." *Guerra*, 24 I&N Dec. at 3. And moreover, an immigration judge lacks the authority to restore a noncitizen to the position they were in prior to an unlawful arrest, only possessing the power to release such an individual on a monetary bond or conditional parole. 8 U.S.C. § 1226(a)(2). Thus, not only would the agency be unable to address Oscar's claims to relief, it would further be unable to grant him the relief he merits in light of Respondents' substantial violations.

A bond hearing before the immigration court would likewise be futile. Not only would the immigration judge be unable to address *any* of the claims raised in the instant petition, *see Pastrana-Beltran*, 2026 WL 1398609, at *3 ("[G]iven the nature of the constitutional violation [Petitioner] sustained here—i.e., Respondents' failure to conduct any kind of individualized assessment before detaining him—any post-deprivation review by an immigration judge would be inadequate.") (citing *Lopez Benitez*, 795 F.Supp.3d at 497), but the process provided therein would be deficient, as the burden of proof in those proceedings would be unconstitutionally placed on Oscar. *See generally Garcia*, 448 F.Supp.3d 297.

---

omitted); *United States v. Gonzalez-Roque*, 301 F.3d 39, 48 (2d Cir. 2002) (internal citation omitted) ("[T]he BIA does not have jurisdiction to adjudicate constitutional issues."); *Quintanilla v. Decker*, No. 21 CIV. 417 (GBD), 2021 WL 707062, at *2 (S.D.N.Y. Feb. 22, 2021) (same); *Velasco Lopez v. Decker*, No. 19-CV-2912 (ALC), 2019 WL 2655806, at *3 (S.D.N.Y. May 15, 2019), *aff'd,* 978 F.3d 842 (2d Cir. 2020) ("[T]he BIA has no authority address issues pertaining to the Constitution.").

Respondents' argument that Oscar faces no irreparable injury is likewise without merit. In conducting the "irreparable injury inquiry," courts "must assume, *arguendo*, unconstitutional government action." *Able v. United States*, 88 F.3d 1280, 1289 (2d Cir. 1996) (addressing exhaustion requirement in the context of a First Amendment challenge). And here, there is no question that Oscar raises substantial constitutional violations resulting in the unlawful deprivation of "the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851; *see also Black*, 103 F.4th 133, 151 (2d Cir. 2024) (quoting *Velasco Lopez*, 978 F.3d at 851); *Zadvydas*, 533 U.S. at 690 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects."). "His interest," therefore, "is just as substantial and the affront to it just as irreparable as the interest and the injury to First Amendment rights in *Able*. *Garcia*, 448 F.Supp.3d at 308 (citing 88 F.3d at 1288–89). Thus, in addition to his claims regarding the conditions of his confinement, Oscar "has alleged irreparable injury: the continued deprivation of his liberty[.]" *Garcia*, 448 F.Supp.3d at 308.

More broadly, requiring Oscar to go before the immigration court would not serve to further the purposes of exhaustion. Oscar's "claim[s] do[] not depend on the interpretation of a law that the immigration agencies are charged with administering." *Id.* at 307. "Instead," Oscar "is asking the Court to interpret the Constitution in order to determine whether his detention is unconstitutional." *Id.* "There is no alternative administrative remedy that he has or can avail himself of,

and the claim would not benefit from further fact-finding." In sum: "If this Court does not hear his claim, no one will." *Id.* at 307.

## CONCLUSION

For the foregoing reasons, Oscar respectfully requests that the Court grant his petition and order his immediate release from custody.

Dated: October 27, 2026

/s/ *Perry Hall McAninch*

Perry Hall McAninch
Elyssa N. Williams
THE LEGAL AID SOCIETY
Immigration Law Unit
49 Thomas Street, Fifth Floor
New York, NY 10013
T: (929) 219-6697
F: (646) 304-0876
pmcaninch@legal-aid.org
ewilliams@legal-aid.org

*Counsel for Petitioner*